**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                       )
DIPING Y. ANDERSON,                    )
                                       )
                    Plaintiff,         )
                                       )
v.                                     )          Civil Action
                                       )          No. 14-13380-PBS
MEGAN J. BRENNAN, Postmaster           )
General,                               )
                                       )
                    Defendants.        )
═══════════════════════════════       )

**MEMORANDUM AND ORDER**

November 23, 2016

Saris, C.J.

**INTRODUCTION**

Diping Anderson was formerly employed as a Postal Police Officer ("PPO") by the U.S. Postal Service. She claims that the Postal Service unlawfully terminated her on the basis of her Chinese descent and in retaliation for her filing multiple complaints of race discrimination with the Equal Employment Opportunity Commission ("EEOC").

The Postal Service moves for summary judgment on the basis that it had a nondiscriminatory reason for terminating Anderson: a series of workplace misconduct incidents. Anderson responds that her workplace misconduct was a pretextual reason for her termination, as evidenced by the fact that she received harsher

1

punishment than similarly situated white PPOs for the same misconduct. Because a factfinder could reasonably conclude that race and/or retaliatory motive was a determining factor in the Postal Service's termination of Anderson, the Postal Service's motion for summary judgment (Docket No. 44) is **DENIED**.

BACKGROUND

## I.   Factual Background

The facts below are taken from the record, and are undisputed except where stated.

Diping Anderson immigrated to the United States from China in 1990. She began working as a PPO on July 15, 2000. She was the only PPO of Asian descent during her thirteen years of employment at the Boston General Mail Facility.

On May 12, 2011, Anderson filed her first pre-complaint statement with the EEOC, alleging race discrimination by her supervisors, Captain Harrington and Sergeant Ford. She alleged that on May 1, 2011, Harrington and Ford impeded her return to work from a workplace injury because of her race.

On May 23, 2011, the EEOC notified Harrington and Ford of Anderson's May 12, 2011 EEOC filing. On May 25, 2011, Anderson came into work to find that her normal chair had been replaced by a broken chair. When she objected, Ford told Anderson to go home if she didn't like it. Anderson went home. On May 26, 2011,

Ford rescinded his approval of her request for leave on May 21, 2011 and changed her status on that day to "AWOL."

On June 15, 2011, the EEOC convened a redress conference between Anderson and her supervisors.

On June 24, 2011, Anderson was issued a seven-day suspension, signed by Ford, for leaving her assigned post without proper authorization. The notice of suspension stated that Anderson had left the facility on May 21, 25, and 26, 2011 without prior approval.

On July 9, 2011, Anderson filed her first formal EEOC complaint. She alleged, among other things, that her seven-day suspension was based on race discrimination.

On March 25, 2012, Anderson filed her second formal complaint with the EEOC, alleging that she was being harassed by her supervisors in retaliation for her prior EEOC filing.

On August 29, 2012, Anderson was issued a Letter of Warning, signed by Sergeant Joseph Motrucinski, for failure to properly protect and secure her service weapon upon the completion of her duties. The letter stated that, on August 1, 2012, Anderson improperly placed her loaded service weapon in her personal locker in the women's changing room at the end of her shift rather than securing it in the designated weapon locker in the weapon room.

On September 11, 2012, Anderson filed a pre-complaint statement with the EEOC alleging that the August 29, 2012 Letter of Warning was retaliation for her prior EEOC complaints.

On September 26, 2012, Anderson was issued a Letter of Warning in Lieu of Fourteen-Day Suspension, signed by Motrucinski. The letter stated three bases for the discipline: failure to follow instructions, failure to secure accountable property, and an integrity violation. According to the letter, Anderson misplaced her keys, including her weapon room key and weapon locker key, on August 17, 2012. She was directed multiple times to complete an incident report, but she refused to do so. The letter also stated that on at least four occasions in July and August 2012, Anderson stored her weapon locker key inside the weapon locker with her service weapon. According to the letter, this was improper behavior because the weapon locker key could be extracted from the weapon locker by anyone through a small hole in the weapon locker door.

On October 19, 2012, Anderson's name was removed from the acting sergeant list.

On December 28, 2012, Anderson filed her third formal complaint with the EEOC, alleging that she was being improperly disciplined in retaliation for her prior EEOC complaints.

On May 9, 2013, an EEOC investigator contacted Ford and Motrucinski to request affidavits in response to Anderson's third formal complaint.

On September 9, 2013, Anderson was issued a Notice of Removal, signed by Motrucinski. The Notice of Removal terminated Anderson from her position for failure to perform her duties. The Notice stated that on June 6, 2013, Anderson was dispatched to the Brockton Processing and Distribution Center, where a fire had left a hole in the facility building. According to the notice, Anderson was directed to stand outside her cruiser to prevent unauthorized access to the facility. However, the Notice stated, Anderson was instead observed sitting in the back seat of her cruiser and appeared to be sleeping. Anderson contests the basis of the termination, claiming that she was not sleeping on the job.

## II.  Procedural Background

On August 15, 2014, Anderson filed a two-count complaint against the Postal Service. The first count alleged race and national original discrimination, in violation of 42 U.S.C. § 2000e-2(a). The second count alleged unlawful retaliation, in violation of 42 U.S.C. § 2000e-3(a). The essential allegation in the complaint was that Anderson was subjected to more severe disciplinary punishment than other similarly situated PPOs because of her race and in retaliation for her EEOC activity.

5

Anderson sought compensatory and punitive damages, as well as reinstatement to employment as a PPO with restoration of seniority and benefits.

On June 3, 2016, the Postal Service filed a motion for summary judgment on both counts. Anderson opposed the motion. This Court held a hearing on August 15, 2016 and took the motion under advisement.

**DISCUSSION**

## I.    Summary Judgment Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed on a motion for summary judgment, the moving party must demonstrate that there is an "absence of evidence to support the nonmoving party's case." Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once such a showing is made, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial," come forward with facts that demonstrate a genuine issue of material fact. Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citing Celotex, 477 U.S. at 324).

"A genuine issue exists where a reasonable jury could resolve the point in favor of the nonmoving party." Meuser v.

Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009). "A party cannot survive summary judgment simply by articulating conclusions the jury might imaginably reach; it must point to evidence that would support those conclusions." Packgen v. BP Expl. & Prod., Inc., 754 F.3d 61, 67 (1st Cir. 2014). A material fact is "one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

In its review of the evidence, this Court must "examin[e] the facts in the light most favorable to the nonmoving party" and draw all reasonable inferences in its favor, to "determine if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Sands, 212 F.3d at 661. This Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation" at the summary judgment stage. Chiang v. Verizon New England Inc., 595 F.3d 26, 30 (1st Cir. 2010). "Ultimately, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 163 (1st Cir. 2009).

## II.  **McDonnell Douglas Framework**

In the absence of direct evidence of discrimination, Title VII claims are analyzed under a three-step burden-shifting

framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973); see also Bhatti v. Trustees of Boston Univ., 659 F.3d 64, 70 (1st Cir. 2011). Under this framework, the plaintiff must first establish a prima facie case of discrimination. Bhatti, 659 F.3d at 70. If she does so, the evidence creates a presumption of discrimination. Id. The burden then shifts to the employer to rebut the presumption by articulating a legitimate, nondiscriminatory reason for the challenged decision. Id. If the employer meets this burden, the burden then returns to the plaintiff to show that the employer's reasons were mere pretext for discrimination. Id. At this final step, the original presumption of discrimination drops out of the case and the trier of fact must decide the ultimate question of whether the plaintiff has proven unlawful discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510–11 (1993).

At the summary judgment stage, the McDonnell Douglas framework operates as follows: If the plaintiff fails to establish a prima facie case of discrimination, the employer's motion for summary judgment is granted. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991). If the plaintiff has made out a prima facie case and the employer has not offered a legitimate, nondiscriminatory justification for the adverse employment action, the employer's motion for summary judgment is denied. Id. At the third step, "the McDonnell Douglas framework

falls by the wayside," id., and "the ultimate question becomes whether, on all the evidence of record, a rational factfinder could conclude that [race] was a determining factor in the employer's decision," id. at 825.

### III. Count I: Race Discrimination

The Postal Service concedes for purposes of its summary judgment motion that Anderson has met her burden under step one to establish a prima facie case of discrimination based on race and national origin.

The Postal Service argues at step two, however, that the Postal Service's decision to terminate Anderson was legitimate and non-discriminatory in light of Anderson's disciplinary record. The Postal Service points to Anderson's August 29, 2012 Letter of Warning; her September 26, 2012 Letter of Warning in Lieu of Fourteen-Day Suspension; and her June 6, 2013 misconduct at the Brockton Processing and Distribution Center.

The inquiry then shifts to step three, where Anderson must show that a factfinder could reasonably conclude that the Postal Service's reasons for disciplinary action were pretextual. There are a number of different ways for Anderson to meet this burden. Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003). One of those ways is "to produce evidence that the plaintiff was treated differently than other similarly situated employees." Id.; see also Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st

Cir. 2015). In considering comparative evidence, "similarity, rather than identicality, provides the essential requirement for an analogy." <u>Conward v. Cambridge Sch. Comm.</u>, 171 F.3d 12, 22 (1st Cir. 1999); <u>see also</u> <u>id.</u> at 20 ("Reasonableness is the touchstone: while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances."). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. . . . In other words, apples should be compared to apples." <u>Dartmouth Review v. Dartmouth Coll.</u>, 889 F.2d 13, 19 (1st Cir. 1989), <u>overruled on other grounds by</u> <u>Educadores Puertorriqueños en Acción v. Hernández</u>, 367 F.3d 61 (1st Cir. 2004).

Anderson produces evidence of a number of comparator cases in which she claims that white employees were disciplined less severely for equal or greater misconduct. According to that evidence, formal disciplinary proceedings are rare for PPOs. Matthew Grealish, who worked as a PPO at the Boston General Mail Facility for forty-one years before retiring, stated that PPOs "have been rarely disciplined and even more rarely fired even when they have clearly and repeatedly violated rules and regulations of the [Postal Service] . . . . Supervisors generally rely on informal talks with officers who have broken

rules, rather than write them up for disciplinary proceedings." Docket No. 48-11 at 2-3. Martha Burris, who worked as a PPO at the Boston General Mail Facility for thirty-two years before retiring, stated: "I have noticed that nearly all violations by PPOs go unpunished when supervisors are aware of them and even when the same PPO breaks the same rules repeatedly." Docket No. 48-12 at 3.

The evidence also contains specific examples of lesser discipline for other PPOs who have been responsible for similar or worse misconduct than Anderson. Misplacing of weapon room keys is, according to evidence in the record, commonplace and generally handled without punishment, or even warning or criticism. As for leaving firearms in changing room lockers instead of in the weapon room, there is evidence in the record that other PPOs and a sergeant have done the same without receiving formal discipline.

In fact, more serious firearm incidents have been dealt with lightly. Motrucinski, now a sergeant but at the time a PPO, lost his service weapon when it fell out of a car onto the streets of South Boston. Motrucinski, who is white, only received a Letter of Warning. Postal Inspector Michael McCarron left his loaded firearm in a public bathroom outside the secure police wing in the Boston General Mail Facility, where it was

found by a janitor. McCarron, who is white, also only received a Letter of Warning.

Anderson also produces evidence that a number of PPOs were notorious for falling asleep on the job and that other PPOs would joke about them. The record contains no evidence that those PPOs were ever disciplined.

The Postal Service responds that those other employees were not similarly situated because the discipline was imposed by other supervisors. The Postal Service is correct that employees who are disciplined by different decision-makers may not be similarly situated. See Stanback v. Best Diversified Prod., Inc., 180 F.3d 903, 910 (8th Cir. 1999) ("When different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects." (quoting Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994))); see also Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618 (7th Cir. 2000) ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently."), overruled on other grounds by Ortiz v. Werner Enterprises, Inc., 834 F.3d 760 (7th Cir. 2016).

But this Court declines to adopt the Postal Service's position that another employee disciplined by a different supervisor cannot, as a categorical rule, be a comparator. Some courts appear to apply such a rule. See Orton-Bell v. Indiana, 759 F.3d 768, 777 (7th Cir. 2014) (stating that a Title VII plaintiff "must at least show" that a comparator dealt with the same supervisor); Muor v. U.S. Bank Nat'l Ass'n, 716 F.3d 1072, 1078 (8th Cir. 2013) (stating that employees used for comparison "must have dealt with the same supervisor"). But other courts have rejected such a rule. See Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 751 (6th Cir. 2012) ("[W]e have never read 'the same supervisor criterium' as an 'inflexible requirement.' Whether it is relevant in a particular case that employees dealt with the same supervisor depends on the facts presented." (quoting Seay v. Tennessee Valley Auth., 339 F.3d 454, 479 (6th Cir. 2003))). The First Circuit does not appear to have taken a position on the question. While the First Circuit in Rodriguez-Cuervos v. Wal-Mart Stores, Inc. rejected a comparator for, among other things, having a different supervisor, that decision did not rule out the possibility that under different factual circumstances, an employee with a different supervisor can nonetheless be a comparator. 181 F.3d 15, 21 (1st Cir. 1999).

Given the facts of this case, this Court concludes that comparators need not necessarily have been disciplined by the

same supervisor as Anderson for a reasonable factfinder to conclude that they were similarly situated. According to Charles Zekan, a Postal Service employee involved in nationwide oversight over PPO discipline cases, the Postal Service emphasizes the "general principle . . . that all employees are treated equitably, equally." A factfinder could conclude that Anderson and the comparator employees were subject to the same standards even if they were disciplined by different supervisors. Moreover, there is record evidence that supervisors knew about the discipline practices of other supervisors: as Grealish stated, "The postal police unit in Boston is rather small and we work in close quarters at the [General Mail Facility] offices; consequently, the officers generally know about violations of rules and disciplinary proceedings involving other officers." See Seay, 339 F.3d at 480.

Under such facts, a reasonable factfinder could find that the other Postal Service employees were similarly situated to Anderson in all relevant respects even if those other employees were disciplined by different supervisors. That comparator evidence could reasonably support a conclusion that Anderson was disciplined differently due to her race. The Postal Service's motion for summary judgment on Count I is **DENIED**.

IV.  **Count II: Unlawful Retaliation**

The Postal Service argues that Anderson cannot even make out a prima facie case of unlawful retaliation. "To make a prima facie showing of retaliation, the plaintiff must show that she engaged in protected conduct, that she suffered an adverse employment action, and that a causal nexus exists between the protected activity and the adverse action." Ponte v. Steelcase Inc., 741 F.3d 310, 321 (1st Cir. 2014). The Postal Service argues that there is no causal nexus between Anderson's EEOC complaints and her termination because of the lack of temporal proximity.

The Postal Service understates the temporal connections in the record. Before her first EEOC complaint, Anderson worked as a PPO for ten years without any disciplinary record. Subsequent to that, there are a number of points in the chronology in which discipline is imposed soon after EEOC activity, making it reasonable for a factfinder to find a nexus between protected activity and an adverse employment action. For example, Anderson's permission for leave was revoked and she was charged with AWOL status on May 26, 2011, which was three days after Harrington and Ford were notified of Anderson's EEOC pre-complaint filing. Anderson's seven-day suspension was imposed on June 24, 2011, which was nine days after the EEOC scheduled a redress conference between Anderson and her supervisors.

15

Anderson's Letter of Warning in Lieu of Fourteen-Day Suspension was issued on September 26, 2012, which was fifteen days after she filed a pre-complaint statement with the EEOC. Anderson's termination was based on events on June 6, 2013, which was about a month after the EEOC requested affidavits from Ford and Motrucinksi in response to Anderson's third EEOC complaint.

While the Postal Service correctly observes that "the inference of a causal connection [between protected activity and alleged retaliation] becomes tenuous with the passage of time," Dressler v. Daniel, 315 F.3d 75, 80 (1st Cir. 2003), the record evidence supports a finding of temporal proximity between her EEOC activity and the allegedly retaliatory actions.

Moreover, Anderson does not rely on temporal proximity alone. See Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) ("[A] gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action." (emphasis added)). Rather, Anderson alleges a pattern of retaliatory conduct beginning soon after her first EEOC activity. She also alleges a direct statement suggesting a causal nexus between her EEOC activity and discipline imposed on her: according to Barris, Ford said after Anderson made her first EEOC complaint that he "wanted Ping out of here."

Anderson has established a prima facie case of retaliation. For the same reasons stated above with respect to Count I, the

Postal Service has put forth a nondiscriminatory explanation for the discipline and Anderson has responded with sufficient evidence to allow a factfinder to conclude that the nondiscriminatory explanation is pretextual. The Postal Service's motion for summary judgment on Count II is **DENIED**.

## ORDER

This Court **DENIES** the defendant's motion for summary judgment (Docket No. 44).

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge