**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                  )
DIPING Y. ANDERSON,               )
                                  )
                Plaintiff,        )
                                  )
v.                                )          Civil Action
                                  )          No. 14-13380-PBS
MEGAN J. BRENNAN, Postmaster      )
General,                          )
                                  )
                Defendant.        )
_____ )

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

March 16, 2017

Saris, C.J.

**INTRODUCTION**

In 2013, Diping Anderson was terminated from her employment as a U.S. Postal Police Officer ("PPO"). Anderson claims that the Postal Service unlawfully terminated her on the basis of her Chinese descent and in retaliation for her filing multiple complaints of race discrimination with the Equal Employment Opportunity Commission ("EEOC").

The Postal Service argues that Anderson's termination was not discriminatory or retaliatory and that she was justifiably terminated for repeated workplace misconduct. Anderson responds that her workplace misconduct was a pretextual basis for her

termination because she received harsher punishment than similarly situated white PPOs for the same misconduct.

After a seven-day bench trial, the Court finds insufficient evidence that Anderson's termination was based on race discrimination. However, Anderson met her burden to show that she was terminated in retaliation for filing complaints of discrimination.

**FINDINGS OF FACT**[1]

**I.   Background**

**A.   Anderson's Personal Background**

Diping Anderson was raised in Shanghai, China and received a bachelor's degree from the Shanghai Institute of Tourism. Anderson immigrated to the United States in 1990 and became a U.S. citizen in 1993. She first began working for the Postal Service in 1995, first as a letter carrier then as a window clerk. In 2000, Anderson became a PPO at the Boston General Mail Facility ("GMF"). Prior to 2011, Anderson received no discipline as a Postal Service employee.

**B.   The Postal Police**

The Postal Police are a uniformed police force whose responsibilities include providing security for postal

---

[1]   The Court states its findings of facts and conclusions of law separately, as required by Federal Rule of Civil Procedure 52(a)(1).

facilities and employees, protecting mail while in transit, and preventing the use of mails for illegitimate purposes.

The role of the Postal Police has evolved somewhat over time. Previously, PPOs were mainly responsible for security watches at entry posts and guard posts. Beginning around 2001, the Postal Police began to contract with private security to handle some of the security work previously carried out by PPOs. A greater portion of PPO work became street patrol and emergency response in marked cruisers. As a result, the work of PPOs became more challenging.

In 2000, there were forty PPOs, four sergeants, and one captain in the Boston Postal Police. By 2013, the Boston Postal Police had shrunk to eighteen PPOs, three sergeants, and one captain.

The command structure of the Postal Police is as follows: PPOs are assigned to one of three shifts, known as Tour One (10:00 PM to 6:30 AM), Tour Two (6:00 AM to 2:30 PM), and Tour Three (2:00 PM to 10:30 PM). PPOs are generally assigned to a single shift, although they may also work overtime on another shift. There is one sergeant in charge of each shift. At times, a PPO from the acting sergeant list may fill in to supervise a shift, but acting sergeants have limited disciplinary authority compared to sergeants.

The sergeants report to the captain. There is one captain who oversees all of the PPOs at the Boston GMF. Gerald Harrington was captain from some unknown time to 2011. Peter Ford was captain from about 2011 to 2013. Joseph Motrucinski was promoted from sergeant to captain in July 2013 and was captain at the time of the trial.

Motrucinski was one of the sergeants who supervised Anderson, and he continued to supervise Anderson when he became the captain. Motrucinski was a sergeant from the end of 2011 to his promotion to captain in July 2013. Prior to 2011, Motrucinski was a PPO.

The captain reports to an Assistant Inspector in Charge. There are two Assistant Inspectors in Charge, and one of those two typically oversees the entire Boston PPO service. The two Assistant Inspectors in Charge report to the Inspector in Charge. Kevin Niland was Assistant Inspector in Charge overseeing PPO operations from 2011 to 2012 and Inspector in Charge from 2012 to 2014.

The Inspector in Charge also oversees postal inspectors. Postal inspectors investigate any crime involving the U.S. mail. Postal inspectors are not uniformed, although at times they may wear jackets identifying them as postal inspectors. Postal inspectors report to team leaders, who in turn report to an

4

Assistant Inspector in Charge, who in turn reports to the
Inspector in Charge.

The Postal Service uses a progressive discipline system.
Discipline builds off previous instances of discipline,
typically beginning with more informal discipline and building
up to more formal discipline as violations continue. However, a
first-time offense, if severe, need not be addressed with the
lowest level of discipline.

The levels of discipline in the Postal Service's
progressive discipline system are the following, ranging from
least to most severe: (1) informal counseling, (2) formal
counseling, (3) Letter of Warning, (4) suspension, and (5)
termination. Neither informal nor formal counseling is recorded
in a PPO's personnel file, although the sergeant that
administered the counseling may keep notes in the sergeant's
file cabinet. Letters of Warning are recorded in a PPO's
personnel file, but they can be expunged if a PPO receives no
further discipline for two years. A fourteen-day suspension is
usually the most severe penalty short of termination.

A sergeant does not need approval from the captain to issue
a Letter of Warning, although the sergeant would inform the
captain. Other than oversight by the same captain, there is no
formal process by which sergeants communicate with sergeants of
other shifts to ensure that discipline is consistent. To issue a

suspension, a sergeant needs the review and concurrence of the captain. To remove a PPO, the captain must obtain the concurrence of the Assistant Inspector in Charge. Sergeants and captains in the Postal Police play no part in the discipline of postal inspectors.

PPOs in practice rarely receive any discipline greater than counseling. Motrucinski has only issued two Letters of Warning since 2011, when he became a sergeant. Both Letters of Warning were issued to Anderson. Motrucinski has only issued one fourteen-day suspension, and that suspension was issued to Anderson. Nor has anybody else ever been removed from the Boston PPO during the period of Motrucinski's employment, which is 1999 to present. Inspector-in-Charge Niland never removed any other employee from the entire seven-state region he oversaw.

Nationwide, about five or six PPOs were terminated in the past three years. Other reasons for termination were misconduct relating to a lost mail auction, plagiarism and falsifying of reports, and sleeping on duty. The PPO terminated for sleeping on duty was terminated pursuant to a last-chance agreement, in which a series of infractions led to a negotiated agreement between the PPO and the Postal Service that any further infraction would lead to termination.

At all relevant times, the Boston PPO workforce was nondiverse. Other than Anderson herself, there were no black,

Hispanic, or Asian PPOs at the Boston GMF during Anderson's
thirteen years as a PPO.

There is no evidence that any PPO in the Boston GMF other
than Anderson ever filed an Equal Employment Opportunity ("EEO")
complaint.[2]

## II.  Timeline of Anderson's EEO Complaints and Discipline

### A.   May 2011 EEO Activity and Seven-Day Suspension

On May 1, 2011, Anderson reported to work following a
period of time off for a workplace injury. She had a doctor's
note approving her return to work, but Captain Harrington
refused to allow her to return to work. On May 12, 2011,
Anderson filed a request for EEO pre-complaint counseling,
alleging race discrimination by Captain Harrington.

Anderson returned to work sometime thereafter. On May 21,
2011, Anderson was assigned to check the identification of
persons entering the GMF at the employee entrance. Anderson left
in the middle of her shift after getting a call from the
hospital where her mother was admitted. Anderson did not receive
prior approval but she filled out an emergency leave request
form and left it on the duty sergeant's desk.

---

[2]    Perhaps one black PPO filed a complaint in the 1980s, back
when there were as many as three black PPOs in Boston. The
evidence on this point was sparse.

On May 23, 2011, an EEO dispute resolution specialist sent an email to Captain Harrington and then-Sergeant Ford informing them of Anderson's EEO filing and requesting to schedule a redress conference.

On May 24, 2011, then-Sergeant Ford approved Anderson's May 21, 2011 leave request by signing her leave request form.

On May 25, 2011, Anderson reported to work to find that her normal chair was gone and a broken and unstable stool had been left in its place. When Anderson went to borrow a different chair from a nearby office, then-Sergeant Ford said: "No. This chair is not authorized." Anderson told Captain Harrington: "I cannot complete my job assignment without a standard size chair because I have an ankle injury. I cannot get on the high chair. Even if I get on, I have a hard time getting off." Captain Harrington responded: "If you don't like it, go home." Anderson told Captain Harrington that she would leave, that she wanted to be put back on workers' compensation status, and that she would return when the broken chair was replaced.

Anderson did not report to work on May 26, 2011 because she never heard from Captain Harrington that the broken chair had been replaced. When then-Sergeant Ford called to ask why she did not report to work, Anderson told him that Captain Harrington had told her to go home. Then-Sergeant Ford told Anderson that he would consider her to be on sick leave.

While Anderson was absent from work on May 26, 2011, then-Sergeant Ford changed her May 21, 2011 leave status to "AWOL" (Away Without Leave). The May 26, 2011 document contained the notation "Changed to AWOL per Capt. H," which Anderson understood to be referring to a directive by Captain Harrington.

On June 15, 2011, Anderson attended an EEO redress conference with Captain Harrington, then-Sergeant Ford, and an EEO mediator. According to Anderson, Captain Harrington and then-Sergeant Ford refused to discuss her allegations of discrimination and told her to file a formal EEO complaint.

On June 24, 2011, then-Sergeant Ford[3] issued Anderson a seven-day suspension for leaving her assigned post prior to being properly relieved or dismissed.[4] The notice of suspension

---

[3]   Captain Motrucinski was a PPO at the time and he had nothing to do with this discipline.

[4]   This seven-day suspension was one of the subjects of a subsequent EEO complaint by Anderson.
    An EEOC Administrative Judge issued an oral decision on September 18, 2012 that dismissed Anderson's complaint. Anderson had claimed, among other things, that her seven-day suspension was racially discriminatory. Anderson also made some claims of retaliation with respect to other workplace incidents, but she did not make a retaliation claim with respect to the seven-day suspension.
    The Administrative Judge dismissed Anderson's discrimination claim because Anderson failed to identify any similarly situated comparator outside her protected group that was treated more favorably. On December 6, 2012, the Postal Service issued a Notice of Final Action adopting the Administrative Judge's decision.

charged Anderson with leaving her post without permission on May
21, 25, and 26, 2011. According to Anderson, this was the first
discipline she ever received as a Postal Service employee.

At some point around this time period, PPO Martha Barris
had several conversations with Captain Harrington in which
Captain Harrington said that he found the EEO complaints
distasteful and that he did not understand why Anderson was
filing them because he was not discriminating against her.

**B.    Early 2012 EEO Activity**

In early 2012, Anderson filed a number of requests for pre-
complaint EEO counseling, alleging various instances of race
discrimination and retaliation that took place on December 16,
21, 22, and 23, 2011; January 11, 2012; and February 15, 16, and
22, 2012. The forms listed Captain Ford as a responsible
official. Then-Sergeant Motrucinski was also named in the last
of the forms.

On March 29, 2012, Anderson filed a formal EEO complaint
alleging race discrimination and retaliation by Captain Ford.[5]

---

[5]    The copy of the EEO complaint entered into evidence as
Plaintiff's Exhibit 14 listed Captain Ford and then-Sergeant
Motrucinski as responsible officials. The Postal Service
subsequently offered into evidence Defendant's Exhibit 16, which
is a copy of the same EEO complaint that appears identical to
the exhibit offered by Anderson -- except that the version
offered by the Postal Service lists only Captain Ford, not then-
Sergeant Motrucinski, as the responsible official. Anderson
admitted that the complaint she originally submitted to the
Postal Service only named Captain Ford as the responsible

C.   **May 25, 2012 Letter of Warning**

On May 23, 2012, Anderson reported to Fort Devens in a marked police cruiser for a semi-annual firearm qualification test but forgot to bring her service weapon. On May 25, 2012, then-Sergeant Motrucinski issued a Letter of Warning to Anderson for failure to carry her firearm during the performance of her official duties. The Letter stated that in addition to being unprepared, Anderson created a danger by traveling in a cruiser without her service weapon because she would not have been able to properly respond if she came across an incident while en route or if she was dispatched to an incident.

PPOs are required to pass the firearm qualification test with their own weapon. If a PPO does not qualify, he or she is placed on nonduty status and cannot work. Motrucinski was the firearm instructor conducting the exam that day and he could have sent Anderson home for failing to bring her weapon. However, because the firing range was not available to the Postal Police for the rest of the year due to unrelated

---

official (although it described some actions by then-Sergeant Motrucinski in the body of the complaint) and that she wrote Motrucinski's name into her copy of the complaint sometime later.

Anderson voluntarily withdrew that complaint in its entirety on October 10, 2012.

The Court finds that Anderson altered her exhibit to bolster her retaliation claim against Captain Motrucinski and that this finding detracts from her credibility as a witness.

circumstances, then-Sergeant Motrucinski made an exception and allowed Anderson to qualify with his firearm.

Anderson did not file an EEO complaint about this Letter of Warning.

### D.   August 29, 2012 Letter of Warning

At the end of her shift on August 1, 2012, Anderson left her loaded service weapon in her personal locker in the female officers' changing room.

When a PPO finishes his or her shift, the PPO is supposed to lock his or her unloaded weapon in a weapon locker in the weapon room. Sergeants routinely check the weapon lockers to verify that weapons have been properly stored. On the day in question, Sergeant Gregg McGee discovered Anderson's weapon missing during his routine weapon locker check. Sergeant McGee cut the lock on Anderson's personal locker with Captain Ford's permission and found Anderson's service weapon. Sergeant McGee took pictures of the weapon in the personal locker and sent them to then-Sergeant Motrucinski and Captain Ford.

On August 29, 2012, then-Sergeant Motrucinski issued Anderson a Letter of Warning for failure to properly protect and secure her service weapon upon the completion of her duties.

Anderson admits that she left her weapon in her personal locker that day when the proper procedure would have been to store it in the weapon locker in the weapon room.

### E.    September 2012 EEO Activity

On September 11, 2012, Anderson filed another request for EEO pre-complaint counseling, alleging that the August 29, 2012 Letter of Warning was unlawful retaliation for her prior EEO activity. Anderson named Captain Ford and then-Sergeant Motrucinski as responsible officials.

### F.    September 26, 2012 Fourteen-Day Suspension

Since the beginning of her time as a PPO, Anderson stored her weapon locker key inside the weapon locker itself, alongside the weapon. When Anderson returned to the weapon locker at the beginning of her next shift, she would extract the weapon locker key from the locker through a hole in the front of the locker.[6]

On July 18, 2012, then-Sergeant Motrucinski instructed Anderson that it was improper for her to store her weapon locker key in this way. Storing the weapon locker key in the weapon locker itself was potentially dangerous because of the possibility that unauthorized persons might gain access to firearms. The weapon room was within the secure part of the GMF that required card or key access, and an additional key was required to access the weapon room. But custodial workers

---

[6]    The weapon locker has a large hole so that the person conducting the weapons count can look through the window to verify that the firearm is stored properly. The hole is large enough to remove a key placed inside the locker, but not large enough to remove the firearm.

routinely entered the weapon room, and there was also an
electrical panel room that maintenance personal and contractors
accessed through the weapon room. The perceived danger is that
someone in the weapon room could take out the weapon locker key
and use it to open the locker and access the weapon.

Anderson ceased storing her weapon locker key in her weapon
locker following her discussion with then-Sergeant Motrucinski.
Nonetheless, Sergeant McGee told then-Sergeant Motrucinski that
during his routine weapons check, he found Anderson's weapon
locker key stored in her weapon locker on July 27, 2012, July
30, 2012, August 1, 2012, and August 17, 2012. This statement to
Motrucinski is unlikely because Sergeant McGee did not confront
Anderson on any of those four days and tell her to cease the
practice, did not tell any of her supervisors, and did not take
pictures of the alleged infractions as was apparently his
practice. On September 5, 2012, then-Sergeant Motrucinski asked
Anderson if she had ever left her weapon locker key in the
weapon locker since their discussion on July 18, 2012. Anderson
replied, "No, never."

On August 17, 2012, Anderson left her keys dangling from
the keyhole on the weapon room door at the end of her shift.
Anderson realized that she was missing her keys when she arrived
for her shift the next day. The keys were recovered and returned
to her the day after that.

14

Anderson was instructed three times to complete an incident report about the misplaced keys: twice by Sergeant Pare and once by then-Sergeant Motrucinski. The day that Anderson realized that her keys were missing, Sergeant Pare told her that she needed to file an incident report for the misplaced keys. Anderson replied that she would. The next day, Sergeant Pare noticed that no incident report had been filed and he approached Anderson about it. Anderson admitted that she had not completed the report but told Sergeant Pare that she had the key back. Sergeant Pare told Anderson that an incident report needed to be completed anyway. Anderson never filed an incident report.

Subsequently, then-Sergeant Motrucinski directed Anderson to complete an incident report for misplacing her weapon room key. Anderson responded that an incident report was not necessary because she had her keys back. Then-Sergeant Motrucinski specifically asked her, "Are you refusing my direct order to complete the incident report?" Anderson replied "yes, I refuse" and left his office.

On September 26, 2012, then-Sergeant Motrucinski issued Anderson a Letter of Warning in Lieu of a Fourteen-Day Suspension[7] that named three infractions: failure to follow

---

[7]      A letter of warning in lieu of a fourteen-day suspension carries the same weight as a fourteen-day suspension on a disciplinary record, but it is a "paper suspension" in which the PPO does not actually take the time off from work.

instructions, failure to secure accountable property, and an integrity violation. The Letter stated that the bases for the discipline were Anderson (1) leaving her weapon locker key in her weapon locker on July 27, July 30, August 1, and August 17, 2012 and lying to then-Sergeant Motrucinski about it, and (2) misplacing her weapon room key on August 17, 2012 and disobeying orders to fill out an incident report.

**G.    November and December 2012 EEO Activity**

On November 16, 2012, Anderson attended another EEO redress conference with Barris, Captain Ford, then-Sergeant Motrucinski, and an EEO mediator.

At the redress conference, Captain Ford and then-Sergeant Motrucinski suggested that if Anderson resigned from her position as a PPO, all of her discipline could be wiped out and she could be offered a position as a post office clerk. Captain Ford and then-Sergeant Motrucinski otherwise refused to discuss the disputes.

Barris had several other conversations with Captain Ford about Anderson's EEO activity around this time period. In one such conversation, Captain Ford got upset about the EEO complaints and yelled: "How dare she do this to me? I've been nothing but nice to her." Captain Ford also said various times: "I want her gone. I want her gone before I retire. I want her gone." Captain Ford also screamed to Barris that he wanted "both

of you gone" because he thought that Barris was encouraging Anderson to file the EEO complaints.

On about December 18, 2012, Anderson filed another request for pre-complaint EEO counseling, charging Captain Ford and then-Sergeant Motrucinski with race discrimination and retaliation for an incident on October 19, 2012. Anderson complained that on that date, she was improperly removed from the acting sergeant's list following her fourteen-day suspension.

On December 26, 2012, Captain Ford and then-Sergeant Motrucinski were served with EEO affidavit requests.

On December 28, 2012, Anderson filed a formal EEO complaint against Captain Ford and then-Sergeant Motrucinski charging them with race discrimination and retaliation.

**H.   June 6, 2013 Brockton Incident**

On June 6, 2013, there was a fire at the Brockton, Massachusetts mail processing and distribution center. When Postal Inspector Patricia Rebello arrived at the scene at about 8:30 AM, the fire was still ongoing. Inspector Rebello took charge of the site as the acting supervisor for security. At around 11:30 AM, the fire marshal turned the building over to the Postal Service. At that point, the building was flooded, there was no electricity, the doors to the building were left open to air out the smoke from the fire, and there was an entire

wall taken out of the side of the building, creating a hole
about 100 feet long and taller than a human being. Vendors were
coming onto the site, as were postal employees, customers
dropping off bulk mail, customers of the credit union located on
the second floor of the building, and people from the public
just showing up to see the fire. Inspector Rebello's primary
concern was to secure the building.

At around 2:00 PM, the inspection service decided to send
PPOs to assist the postal inspectors in maintaining security of
the building. The role of the PPOs was to provide a visible
Postal Police presence to prevent onlookers from getting hurt
and to prevent unauthorized access to the building. Although
there were postal inspectors already in the area, PPO presence
was important because unlike the postal inspectors, the PPOs
were uniformed and easily identifiable as a police presence.

The first PPO to arrive was Anderson, at approximately 2:15
PM. Although the fire had been put out by that time, the
electricity was still out and postal employees were still
loitering. Inspector Rebello instructed Anderson to block a
driveway to restrict vehicle access and address and reroute any
incoming traffic. At some point in the afternoon, Inspector
Rebello reassigned Anderson to the other side of the building,
by the hole in the wall. Inspector Rebello told Anderson that
officer presence was needed because of the employees, venders,

and loiterers trying to access the building, and Inspector
Rebello specifically instructed Anderson to stay out of her
vehicle and walk around her assigned area. Inspector Rebello
instructed Anderson that if she needed a break, she could call
Inspector Foley or herself on the radio -- but that she should
be careful because the bathroom floor might be wet and there
would not be light because the electricity was still out.

Inspector Rebello went to check on Anderson some point that
afternoon, between 4:00 PM and 5:00 PM. Anderson was in the rear
passenger seat with her head tilted back, appearing to be
sleeping. Inspector Rebello walked to the front driver's side of
the cruiser and said loudly, "Ping, are you sleeping in there?"
There was no reaction so Inspector Rebello yelled again, and
Anderson still did not respond. The third time Inspector Rebello
yelled at Anderson, she sat up, shook her head, and looked
around and said "wha . . ." Inspector Rebello told her that
"You're not supposed to be in here sleeping" and that "You're
supposed to have officer presence. You're not to sleep in the
vehicle. You're to be out of the vehicle." Anderson responded,
"Oh, okay. I just sat down." At that time, the building was
still unsecured and there were still postal workers, maintenance
employees, and members of the public loitering on the scene. It
was sometime after Inspector Rebello came across Anderson in the

backseat of her cruiser that Inspector Rebello received the update that the electricity in the facility was back up.

Postal Inspector Mary Ellen Bickett was on the scene from 9:30 AM until about 2:00 PM or 3:00 PM, and she later returned around 6:00 PM. When Inspector Bickett returned to the scene at around 6:00 PM, she observed Anderson sitting in the front passenger seat of her cruiser, leaned back to the side, with a cell phone to her ear. Anderson did not respond to Inspector Bickett's presence or make any other move even though Inspector Bickett pulled up fairly close to her in an unmarked car.

The call log for Anderson's personal cell phone showed that between 1:59 PM and 7:00 PM on June 6, 2013, Anderson was on twelve calls totaling eighty minutes. Among the calls were calls at 3:26 PM for three minutes, 4:07 PM for ten minutes, 4:35 PM for one minute, 4:36 PM for eight minutes, and 4:59 PM for fourteen minutes.

The Court credits Anderson's testimony that she was not actually sleeping in her car. Anderson's cell phone records show that she was on many phone calls during the relevant time span, and it is unlikely that she fell asleep in the car between her phone calls. But Anderson was disobeying Inspector Rebello's instructions by alternating between sitting in her cruiser and standing outside of it. When Anderson was sitting in her

cruiser, she was inattentive and she could have appeared to be asleep to a passerby.

On June 12, 2013, Acting Captain Motrucinski, before performing an investigation, placed Anderson on emergency nonpay status for her misconduct at the Brockton facility.[8] The Court finds this was unwarranted as there was no emergency. Indeed, Anderson later grieved the emergency suspension and received back pay for her period of emergency nonduty status.

While Anderson was suspended, the Postal Service Office of Inspector General ("OIG") conducted an investigation into the Brockton incident. The OIG interviewed Captain Motrucinski on June 25, 2013 and Anderson and Postal Inspectors Patricia Rebello, Mary Ellen Bickett, Ken Walker, Jim Foley, and Scott Kelley on July 1, 2013. The OIG report summarized statements by the interviewees but did not make a factual findings as to what actually took place at Brockton.

On September 9, 2013, Captain Motrucinski[9] issued Anderson a Notice of Removal for failure to perform her duties. The Notice

---

[8]     Section 16.08 of the Collective Bargaining Agreement provides: "A PPO . . .  may be immediately placed in an off-duty status (without pay) by the Employer, but remain on the rolls where the allegation involves . . . failure to observe safety rules and the Security Force regulations . . . . The PPO shall remain on the rolls (non-pay status) until disposition of the case has been made."

[9]     Kevin Niland, as Inspector in Charge, reviewed Captain Motrucinski's decision to remove Anderson. Niland relied on the

explained: "Despite having been placed on full and proper notice that you were to provide a Uniformed presence at the site, you were observed sitting Inside your Postal Police vehicle ('cruiser') when you should have been standing outside the cruiser as a visible presence to prohibit unauthorized access."

The Notice found that Anderson had violated Rule 1-5.7(l) in the Postal Police Officer's Guide (Handbook IS-702), which prohibited "[i]nattentiveness, [i]nefficiency, carelessness, [i]ncompetence, or negligence in the discharge of assigned duties" as well as Rule 2-1.2, which required PPOs to "obey the lawful orders of their supervisors." The Notice then conducted a penalty analysis that began by emphasizing the "serious nature of the offenses [she] committed." The penalty analysis stated that "[t]he following live elements of record have been considered in arriving at this decision" and listed three prior disciplinary actions: (1) the June 24, 2011 seven-day suspension; (2) the August 29, 2012 Letter of Warning; and (3) the September 26, 2012 fourteen-day suspension.[10] The Notice concluded that given Anderson's intentional misconduct and the

---

OIG investigation report in deciding that he would concur with Captain Motrucinski's decision.

[10]    At trial, the Court asked Captain Motrucinski: "If she had had a less severe set of prior disciplinary warnings and suspensions, would you have removed her?" Motrucinski responded: "Possibly. The serious nature of the entire event that day was of great concern to me."

low prospects for her rehabilitation given her past disciplinary record, "there is no penalty short of removal adequate to deter you from such conduct in the future."

**I.   November 19, 2013 EEO Complaint**

On November 18, 2013, Anderson filed an EEO complaint against Captain Motrucinski challenging her removal as racially discriminatory and retaliatory. The Postal Service appears to have issued a final agency decision dismissing the complaint sometime thereafter, but the exact details of agency decision and its date are unknown because Anderson failed to enter all of the pages of the final agency decision into evidence. See Plaintiff's Exhibit 26.

## CONCLUSIONS OF LAW

**I.   <u>Applicable Law</u>**

**A.   Discrimination**

Title VII of the Civil Rights Act of 1964 makes it unlawful for "an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Although this provision does not apply to federal agencies, <u>see</u> <u>id.</u> § 2000e(b)(1) (excluding the United States from the definition of "employer"), Congress expanded Title VII protection to federal employees in the Equal Employment Opportunity Act of 1972, Pub. L. 92-261, 86 Stat. 103 (1972).

See 42 U.S.C. § 2000e-16(a) ("All personnel actions affecting employees . . . in the United States Postal Service . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."). Despite the differences in language between the two provisions, courts have held that "Title VII places the same restrictions on federal . . . agencies as it does on private employers, and so we may construe the latter provision [§ 2000e-16(a)] in terms of the former [§ 2000e-2(a)(1)]." George v. Leavitt, 407 F.3d 405, 411 (D.C. Cir. 2005) (cited with approval in Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010)).

The words "because of" in § 2000e-2(a)(1) invoke "the traditional standard of but-for causation." EEOC v. Abercrombie & Fitch Stores, Inc., 135 S. Ct. 2028, 2032 (2015) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2527 (2013)). But a separate subsection, 42 U.S.C. § 2000e-2(m), relaxes that standard by also prohibiting race discrimination from being "a motivating factor" in termination. Abercrombie, 135 S. Ct. at 2032; Nassar, 133 S. Ct. at 2523 (explaining that for Title VII discrimination claim, "[i]t suffices . . . to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision" and describing that standard as a "lessened causation standard"). As such, Anderson

24

can succeed on her discrimination claim by showing that
discrimination was a but-for cause or a motivating factor for
her termination.[11]

**B.   Retaliation**

Title VII provides that "[i]t shall be an unlawful
employment practice for an employer to discriminate against any
of his employees . . . because [the employee] has opposed any
practice made an unlawful employment practice by [Title VII], or
because he has made a charge, testified, assisted, or
participated in any manner in an investigation, proceeding, or
hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

Like the general discrimination provision, this provision
does not apply directly to federal agencies. See id. § 2000e(b)
(excluding the United States from the definition of "employer").
The separate subsection in Title VII that prohibits
discrimination by federal government employers does not
expressly prohibit retaliation. Id. at § 2000e-16(a). The First
Circuit has "assumed that the antiretaliation provision
applicable to private employers operates to prohibit retaliation

---

[11]    At this point, the McDonnell Douglas burden-shifting
framework has dropped out of the case. The Court, as the fact-
finder in this bench trial, must apply the motivating factor
standard to determine the "ultimate question" of whether
Anderson has met her burden to show that there was
discrimination. Aly v. Mohegan Council, Boy Scouts of Am., 711
F.3d 34, 46-47 (1st Cir. 2013); see also Palmquist v. Shinseki,
689 F.3d 66, 71 (1st Cir. 2012).

in the federal sector." Ayala v. Shinseki, 780 F.3d 52, 55 n.5 (1st Cir. 2015) (quoting Morales-Vallellanes v. Potter, 605 F.3d 27, 35–36 (1st Cir. 2010)). But see Gomez-Perez v. Potter, 553 U.S. 474, 488 n.4 (2008) (declining to decide whether Title VII prohibits retaliation by federal employers).

To bring a successful retaliation claim under Title VII, a plaintiff must prove that "(1) he or she engaged in protected activity under Title VII, (2) he or she suffered an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity." Ray v. Ropes & Gray LLP, 799 F.3d 99, 107 (1st Cir. 2015) (quoting Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010)).

A "causal connection" requires that a plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer." Nassar, 133 S. Ct. at 2534. "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m) [i.e., "motivating factor" analysis for discrimination claims]." Id. at 2533; see also Ponte v. Steelcase Inc., 741 F.3d 310, 321 (1st Cir. 2014). The causation requirement for Anderson's retaliation claim is more stringent than the causation requirement for her discrimination claim. To

succeed on her retaliation claim, Anderson must prove that she would not have been removed but for her EEO activity.

## II.  **Scope of the Inquiry**

Anderson claims that her removal from Postal Service employment was discriminatory and retaliatory, and she seeks damages caused by her removal. But in addition to evidence on the Brockton incident that caused Anderson's removal, the parties also presented extrinsic evidence relating to the Letters of Warning and suspensions that she received prior to her termination. Anderson does not seek damages stemming from those prior disciplinary actions. Any such challenge to the prior disciplinary actions would be untimely. See Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 70-71 (1st Cir. 2011) (explaining that Title VII action by federal employee requires exhaustion of administrative process followed by timely court action, and that failure to meet that requirement "bars the courthouse door").

The Postal Service argues that Anderson's prior disciplinary actions must be taken at face value and the Court cannot inquire into whether the prior discipline was discriminatory or retaliatory. Instead, the Postal Service argues, the Court's inquiry is limited to whether Captain Motrucinski's decision to terminate Anderson was discriminatory or retaliatory given the facts of the Brockton incident and the extent of Anderson's existing disciplinary record.

But the Postal Service stated in its Notice of Removal that its decision to terminate Anderson was not independent of the prior instances in which she was disciplined. The penalty analysis section of Anderson's termination notice stated that "[t]he following live elements of record have been considered in arriving at this decision" and listed three prior disciplinary actions: (1) the June 24, 2011 seven-day suspension; (2) the August 29, 2012 Letter of Warning; and (3) the September 26, 2012 fourteen-day suspension.

As such, the Court's inquiry under Title VII cannot be as narrow as the Postal Service argues. Anderson succeeds in showing a Title VII violation if she shows that race discrimination was a but-for cause or motivating factor of her termination, or if she shows that retaliation was a but-for cause of her termination. See 42 U.S.C. §§ 2000e-2(a)(1), (m), 2000e-3(a). Anderson meets that burden if any of Anderson's three instances of prior discipline would not have been imposed but for discrimination or retaliation and she would not have been terminated but for that prior improper discipline.

## III. Captain Motrucinski's Decision to Remove Anderson

Anderson's misconduct at the Brockton facility merited discipline for two legitimate, nondiscriminatory reasons. First, Anderson demonstrated inattentiveness and negligence in the discharge of her duties, in violation of Rule 1-5.7(l) in the

28

Postal Police Officer's Guide (Handbook IS-702). Two credible witnesses testified that they approached Anderson while she was sitting in her cruiser and that Anderson failed to respond. Anderson's lack of awareness of her surroundings made her ineffective in the "emergent" situation at Brockton that day. The Brockton postal facility was unsecured because there were open access points, including a large hole in the wall, and there were members of the public loitering on the scene even up to the end of the day. Unauthorized access to the facility was dangerous in the aftermath of a big fire. Even with the fire already extinguished and firefighters already gone from the scene, the situation demanded a heightened attention to duty from Anderson.

Second, regardless of whether she was actually sleeping in the car, Anderson disregarded instructions by her supervisors, in violation of Rule 2-1.2 in the Postal Police Officer's Guide (Handbook IS-702). Inspector Rebello found Anderson seated in her cruiser despite an express instruction that she stand outside the cruiser and instructions on how to call for backup when she needed a break. Inspector Rebello instructed Anderson a second time that she needed to remain outside her cruiser, but Inspector Bickett later found Anderson seated in her cruiser, oblivious to her surroundings.

Given that Anderson deserved some discipline for her misconduct at Brockton, the harder question is whether Anderson proved that the decision to impose such a harsh level of discipline was improperly motivated. Anderson argues that removal was overly harsh compared to the discipline imposed on similarly situated employees, that prior discipline was caused by discrimination, and that Captain Motrucinski himself was motivated by discrimination or retaliation.

"[E]vidence that the plaintiff was treated differently than other similarly situated employees" might suggest that what appears to be a nondiscriminatory or nonretaliatory justification for punishment is mere pretext. Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003); see also Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st Cir. 2015). To support an inference of discrimination, the comparator must be "similarly situated to [the plaintiff] in all relevant respects." Kosereis, 331 F.3d at 214 (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)). But identicality is not demanded. Conward, 171 F.3d at 20 ("Reasonableness is the touchstone: while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances."). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly

equivalent and the protagonists similarly situated. . . . In
other words, apples should be compared to apples." Dartmouth
Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989),
overruled on other grounds by Educadores Puertorriqueños en
Acción v. Hernández, 367 F.3d 61 (1st Cir. 2004).

Whether Anderson and a claimed comparator had the same
supervisor is relevant to, but not dispositive of, the question
of whether they were similarly situated. Anderson v. Brennan,
No. CV 14-13380-PBS, 2016 WL 6902342, at *5 (D. Mass. Nov. 23,
2016); see also Bobo v. United Parcel Serv., Inc., 665 F.3d 741,
751 (6th Cir. 2012) ("[W]e have never read 'the same supervisor
criterium' as an 'inflexible requirement.' Whether it is
relevant in a particular case that employees dealt with the same
supervisor depends on the facts presented." (quoting Seay v.
Tenn. Valley Auth., 339 F.3d 454, 479 (6th Cir. 2003))).

Anderson presented comparator evidence about Mike Healey, a
white PPO who regularly fell asleep on duty in the 1980s and
until he retired from the force in about 2005, and Tony
Pasquale, a white PPO who frequently fell asleep on duty in the
1980s and until he retired from the force in 2007. Sergeant
Zanstuck caught each of them sleeping in the parking lot guard
shack or the control room on multiple occasions but did not

impose any discipline at all. Instead, Sergeant Zanstuck would tell them to go get coffee and splash water on their faces.[12]

Healey and Pasquale are sufficiently similar to Anderson. To be sure, lax treatment of sleepy PPOs years ago does not prove that the harsher treatment toward Anderson was unjustified given what appears to be a general increase in expectations for PPOs and the emergent situation in Brockton. But Healey's and Pasquale's work years overlapped with Anderson's and the guard duties at issue were sufficiently similar to be considered. The evidence shows a stark difference in treatment. While Anderson was removed for appearing to be asleep on duty, others who repeatedly slept on duty received a cup of coffee.

Anderson further argues that evidence of a racially derogatory comment made by Captain Motrucinski supports the inference of racial discrimination. But there is only one, uncorroborated piece of evidence in the record pertaining to a racially derogatory comment by Captain Motrucinski. That allegation is that, around 2012 or 2013, Anderson got into a minor vehicle accident and Motrucinski said "everyone knows Chinese people can't drive."[13]

---

[12]    Anderson also presented evidence of misconduct by a PPO named Bernice Blaise. But Blaise retired in 1991, which is so remote in time that she is not an appropriate comparator.

[13]    There is also evidence in the record about racially derogatory comments by Sergeant McGee and Captain Harrington and

Even supposing Captain Motrucinski had made such a remark once (a finding that the Court does not make), it is an isolated remark that does not support an inference of discrimination. "Although statements directly related to the challenged employment action may be highly probative in the pretext inquiry, mere generalized 'stray remarks,' arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001). Captain Motrucinski's alleged comment lacks any temporal or contextual relationship to Anderson's termination.

The Court finds that Captain Motrucinski's decision to discipline Anderson had a legitimate, nondiscriminatory and nonretaliatory justification. However, in light of the lax treatment of similarly situated white PPOs, removal was disproportionate and supports a claim of retaliation particularly in light of the temporal proximity to Anderson's

---

of statements by Captain Ford and Captain Harrington that suggest retaliation. But there is no evidence that any of them were involved in the September 2013 removal decision. Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."); see also Thompson v. Coca-Cola Co., 522 F.3d 168, 178 (1st Cir. 2008).

EEO complaints. The Postal Service argues that removal was warranted by the three prior instances of discipline cited by Motrucinski in the termination notice. The Court takes each of the three disciplinary actions in turn.

## IV.  **Anderson's Three Prior Disciplinary Actions**

### A.   **June 24, 2011 Seven-Day Suspension**

The first discipline that Anderson ever received as a Postal Service employee was a seven-day suspension from then-Sergeant Ford for leaving her assigned post without being properly relieved or dismissed. The timing and circumstances of her suspension provide overwhelming evidence of a retaliatory motive. The Court finds that this discipline would not have been imposed but for retaliation.

On May 23, 2011, Captain Harrington and then-Sergeant Ford were informed of Anderson's EEO filing. Two days later, on May 25, 2011, Anderson arrived at work to find her normal chair replaced by a broken stool. Then-Sergeant Ford refused to allow the broken stool to be replaced by a nearby functioning chair. When Anderson complained to Captain Harrington, he told her that if she did not like it, she could go home. The Postal Service never offered any explanation for then-Sergeant Ford's actions or Captain Harrington's refusal to listen to what appears to have been a valid complaint by Anderson about her work

34

conditions. Nor has the Postal Service offered any evidence that the events did not take place the way Anderson described them.

The following day, May 26, 2011, then-Sergeant Ford rescinded his prior approval of Anderson's May 21, 2011 request-for-leave form and changed Anderson's leave status to "Away Without Leave" with a notation saying "Changed to AWOL per Capt. H[arrington]." The Postal Service has never offered any explanation for Captain Harrington's decision to rescind approval of Anderson's leave.

Then-Sergeant Ford issued Anderson a seven-day suspension for work absences that resulted from this unexplained behavior by her supervisors. The Court finds that the seven-day suspension had no legitimate, nonretaliatory justification. Anderson's May 21, 2011 absence was due to what appears to have been a legitimate family emergency, and there appears to have been no reason for her to be considered Away Without Leave other than her recent EEO activity. Similarly, Anderson's May 25 and 26, 2011 absences were precipitated by harassment of Anderson by her supervisors that cannot be explained by anything other than her recent EEO activity.

The inference of retaliation is strengthened by the fact that this flurry of harassment by Anderson's supervisors took place during a short time period after Anderson's first-ever EEO

activity. Prior to the week in question, Anderson had never been disciplined.

Even if Anderson had been unjustifiably absent from her post on the three days in questions, it is not clear that the Postal Service had a legitimate justification for imposing a seven-day suspension, which is far from the lowest level of discipline available. While the Postal Service's progressive discipline system does not require that discipline start at the lowest level, the Postal Service has offered no justification for skipping the informal counseling, formal counseling, and Letter of Warning stages for a relatively nonsevere, first-time infraction.

Comparator evidence does not support the level of discipline that was imposed. PPO Barris was issued a seven-day suspension in 2012 for taking unscheduled leave on an unspecified number of days. But part of the reason for the suspension was that Barris had a prior Letter of Warning from 2011 for the same infraction, failure to be in regular attendance. The Postal Service has offered no explanation for why Anderson, unlike Barris, did not receive the lower level of discipline for her first offense.

The inference of retaliation finds substantial support in later statements about Anderson's EEO activity by Captain Ford. Captain Ford said in 2012, in response to further EEO activity

36

by Anderson, "I want her gone. I want her gone before I retire.
I want her gone." Captain Ford also reportedly said he wanted
"both of you gone" in reference to his belief that Barris was
helping Anderson file EEO complaints. These statements by Ford
are not stray remarks because they are directly related to
Anderson's EEO activity. See Straughn, 250 F.3d at 36.

The Court concludes that Anderson received her seven-day
suspension -- a key building block for her later removal --
because of retaliation for Anderson's EEO activity.[14]

### B.   August 29, 2012 Letter of Warning

Anderson received a Letter of Warning from then-Sergeant
Motrucinski for leaving her firearm in her personal locker
instead of in her locked weapon locker in the locked weapon
room. Motrucinski credibly justified Anderson's discipline by
the safety risk created by Anderson's failure to follow proper
procedures to secure her firearm at the conclusion of the shift.
The Court finds that this Letter of Warning was neither
discriminatory nor retaliatory.

---

[14]    The Postal Service argues that an administrative judge
found that the seven-day suspension was not discriminatory or
retaliatory. Setting aside the question of whether such a
finding by an administrative judge would preclude the Court from
finding otherwise, the Postal Service simply misreads the
administrative judge's decision. Anderson claimed before the
administrative judge that the seven-day suspension was
discriminatory, but she did not raise a retaliation claim. As
such, the administrative judge made no finding as to whether the
seven-day suspension was retaliatory.

Anderson presented comparator evidence in an unsuccessful attempt to show that this justification was pretextual. Anderson points to evidence that Barris similarly left her weapon in a changing room locker and received only a verbal warning, but that took place in the late 1980s or early 1990s, which is too remote in time to be relevant. PPO Sue Pederson received no discipline for similar infraction in 2011, but the disparity in punishment may be ascribed to the fact that Pederson self-reported her mistake.

Anderson also points to more egregious weapons violations receiving light sentences: Sergeant Zaniewski, who left his service weapon in a car in the repair garage in the 1990s, and then-PPO Motrucinski, who lost his firearm during an unauthorized car stop in 1999. But those examples are remote in time. Finally, Postal Inspector McCarron lost his weapon in a less secure location, the men's bathroom in the unsecured wing of the GMF, and received only a Letter of Warning in 2014. But postal inspectors are subject to an entirely different command structure, and although a single Inspector in Charge oversees both postal inspectors and PPOs, it appears that lower levels of discipline such as Letters of Warning do not rise up to that level of oversight.

The closest comparable is Sergeant Rheault, who left his weapon in his locker in the sergeant's changing room in 2014 and

received only formal counseling from Captain Motrucinski. The nature of the offenses were comparable. The female officers' changing room was within the secure part of the GMF that required card or key access, while the sergeant's changing room was not. However, the sergeant's changing room required a key to enter, while the female officers' changing room was not locked because the female PPOs had a practice of taping over the lock for that door. As such, whether a weapon was improperly left in the female officers' changing room or the sergeant's changing room, there was just one barrier to entry preventing an unauthorized person from accessing the weapon. But Sergeant Rheault had no prior discipline, while Anderson had a recent Letter of Warning for failing to bring her firearm to a firearm qualification test. Anderson's firearm qualification test incident was, like the offense in question, characterized by forgetfulness and inattentiveness with regard to a firearm. Given Anderson's prior related and unchallenged disciplinary history, it was reasonable that Anderson received discipline that was one step higher than Sergeant Rheault's in the progressive discipline system.

There is no evidence that Anderson's May 25, 2012 Letter of Warning for failing to bring her firearm to a firearm qualification test was discriminatory or retaliatory. In fact, the Court infers then-Sergeant Motrucinski's lack of

discriminatory or retaliatory animus in issuing that Letter of
Warning from the fact that he made an exception and allowed
Anderson to borrow his firearm to qualify. That day was the last
opportunity for Anderson to qualify for a while, so if then-
Sergeant Motrucinski had not made that exception, Anderson would
not have qualified and have had to be placed on nonduty status.

      The seven-day suspension that the Court found to be
retaliatory was also part of Anderson's record by this time.
Motrucinski made no claim to have relied on that prior
discipline in deciding on the appropriate level of discipline
for this incident, and the Court finds that even without the
seven-day suspension in the record, the Letter of Warning from
the firearm qualification test would have been sufficient prior
discipline to warrant a Letter of Warning for Anderson leaving
her firearm in her personal locker.

      Anderson produced no evidence of any statements indicating
that then-Sergeant Motrucinski's justification was pretextual
and that the true reason was discrimination or retaliation. As
the Court concluded above, the only alleged racially derogatory
statement by Captain Motrucinski in the record was a stray
remark that does not support an inference of discrimination.

      Anderson also argues that then-Sergeant Motrucinski's
suggestion during the November 2012 EEO redress conference that
Anderson resign from her PPO position indicates retaliation. But

the fact that Anderson's supervisors offered in a mediation
setting to solve a deteriorating workplace situation by
suggesting a position change does not support an inference of
unlawful retaliation.

Anderson's discipline on August 29, 2012 was proportionate
to that of the closest comparator and there is no evidence of
discriminatory or retaliatory intent. The Court concludes that
the August 29, 2012 Letter of Warning was not discriminatory or
retaliatory.

### C.   September 26, 2012 Fourteen-Day Suspension

Anderson received a fourteen-day suspension from then-
Sergeant Motrucinski for (1) misplacing her weapon room key and
refusing to follow direct instructions to fill out an incident
report about it, and (2) failing to properly secure her weapon
locker key on four separate days.

Comparable employees were not treated so harshly. The
general practice for misplaced keys is that keys are returned to
the owner without punishment. While Anderson did not follow her
supervisors' orders to file a report about the misplaced key,
the only evidence in the record of anyone ever being asked to
write an incident report for misplacing keys was when Barris
lost her keys outside the secured area of the GMF, on the
street. Anderson lost her keys within the secured area of the
GMF, which posed much less danger, and Anderson did not file a

41

report because the keys were found the next morning. In these circumstances, failure to file a report was less serious.

If Anderson had disobeyed and lied to Captain Motrucinski about her storage of her weapon locker key, then that would have been a serious offense. However, the Court finds that Anderson did not store her weapon locker key in her weapon locker on the four dates in question. Anderson's testimony on this point was credible. If Anderson had actually left her weapon locker key in the weapon locker following the warning from Captain Motrucinski not to do so, and if that practice was as dangerous as the Postal Service now claims it was, it is unlikely that Captain Motrucinski or Sergeant McGee would have waited to confront Anderson until after the fourth time her weapon locker key was found in her weapon locker, particularly in light of the hostility to her as a result of the repeated EEO complaints.

The Court concludes that the severity of the fourteen-day suspension for Anderson's minor infraction was not justified. Anderson's actions were not sufficiently serious to warrant the jump from the Letter of Warning stage to the most serious form of discipline available before termination. The Court draws an inference of retaliation by Motrucinski based on that unwarranted harshness and the fact that the suspension was imposed just two weeks after Anderson filed a request for

another pre-EEO complaint counseling that named then-Sergeant
Motrucinski as the responsible officer.

### D.   Impact on Removal Decision

To reiterate, the Court finds that two of the three
predicate offenses referenced in Anderson's notice of removal --
the seven-day suspension and the fourteen-day suspension -- were
retaliatory. Anderson failed to prove that the third cited
discipline, the Letter of Warning, was discriminatory or
retaliatory.

Anderson's Notice of Removal stated that Captain
Motrucinski "considered" the three prior offenses in arriving at
his decision. The Court finds that if the two more serious
pieces of discipline were removed from consideration, Anderson
would not have been removed even given her misconduct at the
Brockton facility. The only other instance of any PPO anywhere
in the country being removed for a similar offense was when a
PPO was removed for sleeping on duty while subject to a last-
chance agreement, which is a negotiated agreement between the
PPO and the Postal Service that because of repeated misconduct,
any further infraction would lead to separation.

The Court concludes that Anderson would not have been
removed but for her two prior retaliatory suspensions and that
Captain Motrucinski had a retaliatory motive for her
termination.

**V.**   **Damages**

Anderson seeks three alternative remedies. Her preferred remedy is reinstatement as a PPO at the Boston GMF, plus back wages, lost pension and medical benefits, earned sick leave, emotional distress damages, and attorneys' fees. In the alternative, Anderson seeks reinstatement as a full time window clerk for the Postal Service plus the same financial compensation as the first option. If the Court chooses not to order reinstatement, Anderson seeks front pay for five years plus the same financial compensation as the first option.

Reinstatement is an equitable remedy within the discretion of the district court. Selgas v. Am. Airlines, Inc., 104 F.3d 9, 12 (1st Cir. 1997). "Front pay should not be awarded unless reinstatement is impracticable or impossible. Even then, awards of front pay are discretionary, in part because they necessarily involve predictions of events yet to come." Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 380 (1st Cir. 2004); Lussier v. Runyon, 50 F.3d 1103, 1108 (1st Cir. 1995) ("[F]ront pay, within the employment discrimination universe, is generally equitable in nature. . . . Title VII . . . afford[s] trial courts wide latitude to award or withhold front pay according to established principles of equity and the idiocratic circumstances of each case.").

44

In contrast, back pay, although also equitable in nature, is "a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case." Johnson, 364 F.3d at 379 (quoting Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1171 (6th Cir. 1996)). Back pay is subject to mitigation "by any wages that could have been earned with reasonable diligence after the illegal discharge, regardless of whether they were actually earned." Id.

Reasonable attorneys' fees are available to the prevailing party in a Title VII suit. Fontanillas-Lopez v. Morell Bauzá Cartagena & Dapena, LLC, 832 F.3d 50, 59 (1st Cir. 2016) (citing 42 U.S.C. § 2000e-5(k)).

The Court finds that reinstatement as a PPO is inappropriate because of the hostility between Anderson and her supervisors. The Boston GMF has a small workforce of PPOs and Anderson's relationship with the captain and at least one of the three shift sergeants is irreparably antagonistic. Moreover, Anderson was far from a model employee. She was not careful with storage of her firearm, and could be rude to her supervisors. The Court finds the potential disruption in the Boston GMF to be more than the "routinely incidental burdens" associated with the "ordinary, garden-variety, return-to-work scenario." Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 43 (1st Cir. 2003).

The Court finds that reinstatement to Anderson's prior
position within the Postal Service as a window clerk is
appropriate. Reinstatement is the "preferred remedy under Title
VII," Valentin-Almeyda v. Municipality Of Aguadilla, 447 F.3d
85, 105 (1st Cir. 2006), and the Court has "wide discretion [to]
exercis[e] [its] equitable powers to fashion the most complete
relief possible." Albemarle Paper Co. v. Moody, 422 U.S. 405,
421 (1975) (quoting 118 Cong. Rec. 7168 (1972)). As such, front
pay is denied.

Anderson claims three years of back pay at her 2012 total
compensation, which was $101,987 when accounting for the value
of benefits. That totals $305,961. She claims $82,797 in
mitigation,[15] leading to a total lost compensation of $223,164.
The Court finds that Anderson is entitled to the amount of
$223,164 for back pay.

In her post-trial supplemental proposed findings of fact,
Anderson also claims $136,000 in lost pension benefits, $6,918

---

[15]    Mitigation is a statutory duty on the plaintiff, Johnson,
364 F.3d at 379, but the employer has the burden of proof on
failure to mitigate, Booker v. Taylor Milk Co., 64 F.3d 860, 864
(3d Cir. 1995). The Postal Service failed to enter any evidence
on mitigation. Anderson states that her income from unemployment
benefits and other employment since her termination was $82,797,
but that figure is merely stated in her post-trial supplemental
proposed findings of fact and is not based on any evidence
entered at trial. Given the lack of any evidence on mitigation
and the government's failure to object to that figure, the Court
takes Anderson's mitigation figure at face value.

in earned sick leave owed at termination, and $8,900 owed for medical expenses incurred after termination of her employer-based health insurance. But Anderson does not point to any evidence in the record to prove those figures and as such, those claims are denied.

Anderson also seeks emotional distress damages of $200,000 based on expert testimony by Dr. Stuart Grassian, a psychiatrist who conducted a clinical evaluation of Anderson, and medical records from Massachusetts General Hospital.

Dr. Grassian's opinion was based primarily on a four-hour interview of Anderson, conducted on February 6, 2016 for the purpose of litigation. That interview was in the presence of Anderson's son, who at times served as translator. Dr. Grassian considered Anderson's self-reporting of workplace events as credible based on her demeanor while recalling the events and the level of details she provided. Dr. Grassian also interviewed Anderson's son and her friend Matthew Grealish for an hour each. Dr. Grassian also considered Massachusetts General Hospital records for Anderson dating back to 2011, as well as documents on postal discipline provided by Anderson.

Dr. Grassian's opinion was that Anderson "suffers from the full gamut of symptoms that are described as post-traumatic stress disorder, and that she has a very severe depression that I believe likely would meet the criteria for major depression."

47

According to Dr. Grassian, Anderson suffers from intrusive memories that hound her during the day and in her dreams, intense irritability and anger, and a loss of interest in her usual activities. Dr. Grassian described her prognosis for future improvement as "very dim."

Dr. Grassian testified that the onset of Anderson's symptoms correlated with the timing of the workplace events that she perceived as discriminatory and retaliatory. According to Dr. Grassian, Anderson began suffering from her emotional disorders around 2011 and increasingly so since September 2013. As such, Dr. Grassian believes that the Postal Service discipline caused Anderson's symptoms.

The Court gives Dr. Grassian's report less weight because he was a litigation expert who based his opinion primarily on self-reporting by Anderson in one interview. Although he stated that he reviewed prior treatment records, he did not appear to have much knowledge of the contents of those records. While Dr. Grassian concluded that Anderson had "symptoms that are described as post-traumatic stress disorder" and "very severe depression that I believe likely would meet the criteria for major depression," Anderson's treatment records at Massachusetts General Hospital dating back to 2011 characterize her as having "Adjustment Disorder with Mixed Depression and Anxiety."

Anderson does not point to any treatment records describing symptoms of post-traumatic stress disorder or severe depression.

Anderson's testimony relating to damages is that she has had trouble sleeping in recent years due to anxiety and that she is taking prescribed sleep medications. Since about 2011, she has lost interest in her usual activities and she has been feeling depressed. Since being removed from her job as a PPO, she has experienced headaches, appetite fluctuations, and stomach problems leading to frequent diarrhea. She has been seeing a psychiatrist, Dr. Charles Morrill, since 2011.

While the Court credits Anderson's testimony that she suffers from some physical manifestations of her emotional distress, the evidence on causation is mixed. Dr. Grassian testified that the onset of her symptoms correlated with the timing of the workplace discipline. But according to Dr. Grassian's report, Anderson spoke to him about significant interpersonal conflicts that she had with another PPO that predated her first discipline from a supervisor. Anderson told Dr. Grassian that her conflict with that PPO, Lisa Smith, dates back to the beginning of her employment at the Postal Service, and that her workplace stress began in 2008 when Lisa Smith began repeatedly filing false accusations that Anderson had assaulted her. Anderson perceived Lisa Smith's actions to be based on discrimination. To the extent that Anderson's mental

distress was caused by her subjective experiences of workplace conflict that were not related to the retaliatory discipline proven at trial, compensatory damages are not appropriate.

Additionally, not all of the emotional distress that Anderson experienced from workplace discipline is attributable to her termination. Anderson was not an exemplary employee, and she exhibited carelessness in some of her job functions. Some level of discipline was appropriate for her failure to follow orders in Brockton, and such discipline would have caused stress. Nonetheless, the Court finds sufficient evidence that Anderson's symptoms were worsened by her termination from the Postal Service. The Court finds that $25,000 is a reasonable award of compensatory damages for Anderson's emotional distress from the termination.

Finally, Anderson seeks attorneys' fees. There is no evidence on the amount of attorneys' fees before the Court at this time but Anderson may file a timely motion for attorneys' fees under Federal Rule of Civil Procedure 54(d)(2).

In sum, the total amount of proven damages is $223,164 for back pay and $25,000 in compensatory damages, totaling $248,164.

## ORDER

The Court finds in favor of Anderson and enters judgment for $225,664 for Anderson, plus statutory interest and attorneys' fees. The Court also orders reinstatement in a full-

time window clerk position with credit for her seniority and

pension rights.

/s/PATTI B. SARIS_____
Patti B. Saris
Chief United States District Judge